**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Stuart Komrower, Esq.
Ryan T. Jareck, Esq.
Matteo W. Percontino, Esq.
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Facsimile:  (201) 489-1536
Email: msirota@coleschotz.com
         skomrower@coleschotz.com
         rjareck@coleschotz.com
         mpercontino@coleschotz.com

*Proposed Counsel for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RTW RETAILWINDS, INC., *et al.,* | Case No. 20-18445 (JKS) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: RTW Retailwinds, Inc. (1445); Lerner New York Holding, Inc. (2460); Lernco, Inc. (4787); Lerner New York, Inc. (2137); New York & Company, Inc. (4569); Lerner New York GC, LLC (6095); Lerner New York Outlet, LLC (6617); New York & Company Stores, Inc. (6483); FTF GC, LLC (7341); Lerner New York FTF, LLC (6279); Fashion to Figure, LLC (6997); FTF IP Company, Inc. (6936).  The Debtors' principal place of business is 330 W. 34th St., 9th Floor, New York, New York 10001.

TO THE HONORABLE JOHN K. SHERWOOD:

RTW Retailwinds, Inc. and its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), hereby move this Court for entry of an Order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), pursuant to sections 105(a), 363(b), 503(b), 503(c) and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**"): (a) authorizing, but not directing, the Debtors to implement the proposed key employee incentive plans (the "**KEIP**") and key employee retention plan (the "**KERP**"), (b) granting administrative expense priority status to the incentive and retention payments, and (c) granting such other relief as the Court deems appropriate.  In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Robert Shapiro in Support of Debtors' Motion for Entry of an Order Approving Debtors' Key Employee Incentive Plan and Key Employee Retention Plan* (the "**Shapiro Declaration**"), attached hereto as **Exhibit B**.  In further support of the Motion, the Debtors, by and through their undersigned proposed counsel, respectfully represent as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) the *Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United States District Court for the District of New Jersey*, dated September 18, 2012 (Simandle, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The bases for the relief requested herein are sections 105(a), 363(b), 503(b), 503(c), and 507(a)(2) of the Bankruptcy Code.

60917/0001-20725139v3

## II.    PRELIMINARY STATEMENT

3.      Retaining key employees and incentivizing senior management to undertake the extraordinary efforts necessary at this most critical juncture of the Debtors' sale and liquidation process are essential to maximizing recoveries to stakeholders in these bankruptcy proceedings. Having focused at the outset on preparing and filing the bid procedures governing the going concern sale process of the Debtors' eCommerce business, the Debtors immediately turned their attention to putting in place suitable KEIP and KERP programs.

4.      Given the critical roles played by the eligible employees in the Debtors' sale and liquidation process, the Debtors submit that the relief sought herein is not only in the estates' best interest, but also appropriately tailored and critical to the Debtors' ability to maximize value for all interested parties. Accordingly, for the reasons set forth herein, the Debtors seek approval of the KEIP and the KERP on the terms described below.

## III.    BACKGROUND

### A.    General Background

5.      On July 13, 2020 (the "**Petition Date**"), each of the Debtors commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

6.      The Debtors' cases are being jointly administered under lead Case No. 20-18445 (JKS) pursuant to Bankruptcy Rule 1015 [Docket No. 65].

7.      Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the

*Declaration of Robert Shapiro in Support of Debtors' Chapter 11 Petitions and First Day*

*Pleadings* (the "**First Day Declaration**") filed on July 13, 2020 [Docket Nos. 25 and 28].

**B.**    **The Debtors' Business, Employees, and the Chapter 11 Cases**

8.      As set forth in the First Day Declaration, the Debtors are an omni-channel

women's fashion retailer providing curated lifestyle solutions that are versatile, on-trend and

stylish at a great value.  The Debtors operate 387 retail stores in 32 states while also growing a

substantial eCommerce business.

9.      As of the Petition Date, the Debtors employed approximately 4,556 employees,

including approximately 386 full-time salaried employees (the "**Salaried Employees**") and

4,170 hourly employees (the "**Hourly Employees**," and collectively with the Salaried

Employees, the "**Employees**").  In broad terms, the Debtors' workforce is comprised of (i) in-

store Employees, including, store managers and associates and other employees that work at the

Debtors' various store locations; and (ii) employees that work at the Debtors' brand

headquarters, including corporate and senior level employees.  Some of the Debtors' store

Employees are covered by collective bargaining agreements with Local 1102 RWDSU UFCW.

The Debtors' Employees perform a variety of critical functions, including sales, customer

service, information technology, purchasing, administrative, legal, human resources, accounting,

finance and management-related tasks.  The skills and experience of the Debtors' Employees, as

well as their relationships with customers and vendors and knowledge of the Debtors'

infrastructure, are essential to the Debtors' success in these chapter 11 cases.

10.     As more fully described in the First Day Declaration, the Debtors filed these

chapter 11 cases to conduct a sale process of their eCommerce business and simultaneously

initiate a wind-down of their business operations and liquidation of inventory in their retail

stores. The Debtors believe this to be the best path to maximize the value of the Debtors' estates and distributions to creditors.

11.     To that end, on the Petition Date, the Debtors filed (i) the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consultant Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Approving the Implementation of Customary Store Bonus Program and Payments to Non-Insiders Thereunder* [Docket No. 23] (the "**Store Closing Motion**").  On July 15, 2020, the Court entered an Interim Order granting the Store Closing Motion [Docket No. 63].  On July 16, 2020, the Debtors commenced store closing sales and anticipate those sales to continue over the course of approximately ninety (90) days.

12.     In addition, on July 17, 2020 the Debtors filed the *Debtors' Motion for (I) an Order (A) Approving Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Certain of the Debtors' Assets, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing and (E) Granting Related Relief, and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No. 80] (the "**Bidding Procedures and Sale Motion**").  The Bidding Procedures and Sale Motion requests, among other things, that the Debtors be permitted to hold an auction for the sale of its eCommerce business on August 28, 2020, and that the Court schedule a sale hearing on September 3, 2020 (the "**Sale**").

60917/0001-20725139v3

13.     Notwithstanding the significant progress made in the sale and restructuring

processes, much work remains.  This work will demand extraordinary amounts of time,

dedication, and focus from the Employees during the restructuring process—particularly in light

of the current economic conditions.  The burden of managing the bankruptcy process and the

strategic restructuring process has been added to already demanding workloads for the

Employees, which has been further compounded by the COVID-19 pandemic, who are working

tirelessly to achieve the best possible outcome for these Chapter 11 Cases.  For many

Employees, their tireless work to achieve the best possible outcome for the estates will result in

their own ultimate loss of employment.

14.     Given the challenging working conditions and uncertain future job prospects with

the Debtors, the Debtors must incentivize key Employees during these Chapter 11 Cases to

maintain the leadership and stability required to ensure the success of the Debtors' restructuring

and achievement of the Debtors' goals in these Chapter 11 Cases.

**C.**     **The Prepetition Retention Program**

15.     Prior to the Petition Date, in April 2020, the Debtors implemented a retention

program geared towards ensuring that select employees remained with the Debtors until

December 31, 2020 (the "**Prepetition Retention Program**").  Shapiro Declaration, at ¶ 6.  The

Debtors underwent a rigorous selection process when developing the Prepetition Retention

Program, whereby retention risk and business impact were analyzed for each employee to

determine the appropriate scope for participation in the Prepetition Retention Program.  *Id.* Only

employees with a high business impact and some level of retention risk were included in the

Prepetition Retention Program.  *Id.*  Depending on the level of retention risk and each

Employee's perceived criticality to the business, eligible employees receive a retention amount

equal to between 18% and 100% of such Prepetition Retention Program participants' base salary.

6

*Id.* Total payouts under the Prepetition Retention Program were $2,350,000 to thirteen (13) employees. *Id.*

16.    In short time since the Petition Date, the Debtors have already lost one critical employee that was a participant in the Prepetition Retention Program. Shapiro Declaration, at ¶ 7. Accordingly, the Debtors and their advisors determined that it was in the estates' best interest to implement an additional retention program during these bankruptcy proceedings (and expand its reach) for those individuals who are deemed to be critical to the Debtors' ongoing operations and who present retention risk and would be difficult to replace, and seek Court approval thereof. *Id.*

17.    Seven (7) KERP Participants (as defined below) were participants in the Prepetition Retention Program, and eleven (11) previous non-participants have been added to further secure the Debtors' critical workforce during this pivotal stage of the bankruptcy proceedings. Shapiro Declaration, at ¶ 8. As with the Prepetition Retention Program participants, each KERP Participant was carefully selected and deemed critical to the Debtors' ability to maximize value for the benefit of all interested parties. *Id.* Without payments under the proposed KERP, the Debtors believe that the KERP Participants are likely to pursue alternative employment, harming the value of the estates and affecting the implementation of the sale and liquidation process. *Id.*

60917/0001-20725139v3

**D.**    **The KERP and KEIP Plan**[2]

18.    The Debtors operate in extremely competitive retail markets. Given the uncertainty created by the Chapter 11 Cases, the Debtors, in consultation with their advisors, determined it was necessary to formulate and adopt a comprehensive compensation program for certain Employees to appropriately incentivize continued optimal performance and to avoid losing these vital Employees at this critical stage in the Debtors' Chapter 11 Cases.

19.    The KERP and KEIP Plan (as defined herein) is designed to (i) encourage the retention of eighteen (18) valuable, hard-to-replace, non-senior management and non-insider Employees (collectively, the "**KERP Participants**,"); and (ii) provide performance incentives to five (5) senior management Employees (collectively, the "**KEIP Participants**") and together with the KERP Participants, the "**Participants**"), who are essential to the Debtors' restructuring and will aid in maximizing the value of the Debtors' estates for the benefit of all of their stakeholders. Shapiro Declaration, at ¶ 11. Lists of the KERP Participants and KEIP Participants are attached as Schedules I and II, respectively, to the KERP and KEIP Plan.[3]

**(i)**    **The KERP**

20.    The KERP is designed to help ensure that valuable, hard-to-replace, non-insider, non-senior management Employees who are important to the Debtors' restructuring are retained and properly motivated to preserve and maximize the value of the Debtors' business for the

---

[2] This summary of the KERP and KEIP is qualified in its entirety by the terms of the RTW Retailwinds Key Employee Incentive and Retention Plan (the "**KERP and KEIP Plan**") attached as Exhibit 1 to the Proposed Order. To the extent any inconsistency exists between this summary and the KERP and KEIP Plan, the terms of the KERP and KEIP Plan will control. Capitalized terms used in the summary of the KERP and KEIP Plan shall have the meanings ascribed to them in the KERP and KEIP Plan.

[3] Because of the sensitive nature of the information contained in the KERP and KEIP Plan, and to protect the privacy of the Employees, the Debtors have filed a motion concurrently herewith requesting authority to seal certain information contained in the KERP and KEIP Plan and the related schedules.

benefit of stakeholders in these Chapter 11 Cases. Shapiro Declaration, at ¶ 11. The Debtors

seek to provide what the Debtors respectfully submit are reasonable and market incentives to

retain KERP Participants so that they continue their employment with the Debtors despite the

challenging operating environment and uncertainty. The KERP will incentivize these non-

insider Employees, whom the Debtors have identified as important to the success of their

restructuring efforts, to remain with the Debtors as they pursue their restructuring efforts, as well

as to help manage the Debtors' ongoing operations and the administration of the Debtors' estates

during the Chapter 11 Cases. Shapiro Declaration, at ¶ 11.

21.    The Debtors have identified eighteen (18) Employees listed on Schedule I to the

KERP and KEIP Plan to participate in the KERP. Each KERP Participant was carefully selected

by management and deemed critical to the Debtors' ability to maximize value for the benefit of

all interested parties. Shapiro Declaration, at ¶ 11. Without payments under the proposed

KERP, the Debtors believe that the KERP Participants are likely to pursue alternative

employment, harming the value of the estates and negatively affecting the Debtors' restructuring

efforts. *Id.*

22.    "KERP Bonuses" will be payable to each KERP Participant in the respective

amounts identified on Schedule I to the KERP and KEIP Plan as follows (the "**KERP**

**Bonuses**"): (i) 50% upon 30 days after the conclusion of the store closing sales pursuant to the

Store Closing Motion; and (iii) 50% upon the earlier of the Employee's termination or December

31, 2020 (each such date shall be a KERP Effective Date and collectively are referred to as the

"**KERP Effective Date**"). Shapiro Declaration, at ¶ 12.

23.    The total potential aggregate payout under the KERP is $625,000. The KERP

Bonuses on average equal 14% of the KERP Participants' annual salary. Shapiro Declaration, at

¶ 12.  In addition to the KERP requirements above, in order to earn a KERP Bonus, the KERP

Participant must be employed by the Debtors on the respective KERP Effective Date unless,

prior to such date, the KERP Participant (i) is involuntarily terminated by the Debtors for any

reason other than "for Cause," (ii) is placed on disability, or (iii) dies. The KERP Bonuses shall

vest on the respective KERP Effective Date and shall be paid in the first regular pay period

following the respective KERP Effective Date.

24.    While a couple of the KERP Participants have titles that include words such as

"vice president" which may suggest officer status, none of the KERP Participants is, in reality,

an "insider" as defined in the Bankruptcy Code or under applicable law.  Although the KERP

Participants are valuable to the Debtors' business and are particularly vital during these Chapter

11 Cases, their titles do not reflect that such Employees control the Debtors' operations. Each

KERP Participant with the title of "vice president," or the like, which are common in the

Debtors' industry, (i) has no corporate policy making authority or authority as to the disposition

of the Debtors' assets, (ii) has no final decision making authority to make company-wide

decisions, but rather is required to report to a more senior employee of the Debtors, which

employee is required to approve any decisions, (iii) has no or limited signatory authority for the

Debtors, and (iv) is not a named "executive officer."  Shapiro Declaration, at ¶ 13.

25.    In addition, no KERP Participant is a member of the Board, was appointed by, or

reports to, the Board.  Further, the KERP Participants' duties do not extend to the Debtors'

business operations as a whole, but rather, are restricted to particular aspects or segments of the

Debtors' business, and no KERP Participant has authority to make company-wide decisions on

the Debtors' behalf.  Shapiro Declaration, at ¶ 14.

26.    The Debtors believe that the award opportunities provided under the KERP are consistent with market practice for similarly situated retailers and are, both individually and collectively, reasonable under the circumstances of these Chapter 11 Cases.  Further, the Debtors believe their proposed KERP fairly addresses their need to preserve and maintain operational and workforce stability with a reasonable, retention-based program.

**(ii)    The KEIP**

27.    The KEIP is designed to incentivize five (5) KEIP Participants, who hold critical operational leadership or corporate management positions, to preserve and maximize the value of the Debtors' business for the benefit of its stakeholders in these Chapter 11 Cases.  The Debtors rely on the KEIP Participants' expertise to make decisions that support the operations and drive the financial performance of the Debtors' businesses.  Shapiro Declaration, at ¶ 18.  The KEIP Participants are responsible for, among other things, essential day-to-day business functions, executing the Debtor' business plan, implementing the operational goals of the Debtors, participating in the Debtors' efforts to successfully effectuate a Sale, participating in the Debtors' efforts related to the store closing sales, assisting counsel in the preparation of essential reporting and bankruptcy-related documents, managing the Employees, and responding to requests for diligence by and conducting management presentations for non-debtor parties in connection with the Sale.  Given their essential role in the Debtors' enterprise as officers and executive management, these individuals are best positioned to drive performance and results with respect to the Debtors' restructuring goals and have taken on substantial tasks and responsibilities to help effectuate and further the Debtors' proposed restructuring, in addition to their existing responsibilities.

60917/0001-20725139v3

28.     Each KEIP Participant, with his or her title and "Target KEIP Bonus," is set forth on Schedule II attached to the KERP/KEIP Plan.  There are five (5) KEIP Participants, which were identified by senior management and approved by the Business Transformation Committee ("**BTC**") of the Board of Directors (the "**Board**") of RTW Retailwinds, Inc. The KEIP Participants may earn incentive awards totaling $900,000 (the "**KEIP Bonus**"), or on average, $180,000 per person, which will be payable, if at all, upon the later of (x) the Sale; and (y) the conclusion of the store closing sales (the later of (x) or (y), the "**Target Trigger**"), in either case that provide for: (1) the successful repayment of all senior secured debt; (2) sufficient liquidity at the time of the Target Trigger to cover all anticipated administrative expense claims based on reasonable estimates under a plan or in the wind-down budget following the sale; and (3) excess proceeds after items (1) and (2) of $15,000,000 (the "**KEIP Target**").  Shapiro Declaration, at ¶ 21.  The BTC will determine whether the KEIP Target is met.  For the avoidance of doubt, the KEIP Participants shall be entitled to share in the KEIP Bonus provided the distributable proceeds through either a Sale or liquidation, exceed $15,000,000, after payment of (1) and (2) referenced above.

29.     The KEIP Target is designed to measure an outcome within management's control and is a key indicator of the Debtors' performance and the success of these Chapter 11 Cases.  Accordingly, the KEIP Target is well suited to incentivize, measure, and reward the KEIP Participants' performance.

**E.**    **Market Based Design of KEIP & KERP**

30.     In March, 2020, the Debtors engaged Berkeley Research Group, LLC ("**BRG**") to serve as its restructuring advisor and provide financial advice to the Debtors and to facilitate discussions with the Debtors' capital structure constituents.  BRG assisted the Debtors in designing the KERP and KEIP Plan. In designing the KERP and KEIP Plan, the Debtors sought

12

to ensure conservative, but appropriate, compensation levels for Participants based on market comparisons as well as key employee incentive and retention plans in other chapter 11 cases. BRG analyzed the KERP and KEIP Plan under two (2) separate tests for reasonableness, including (1) a bankruptcy compensation comparison of the total cost of the KERP and KEIP Plan to other plans approved by courts in similar cases, including key metrics such as KEIP as a percentage of revenue and KEIP as a percentage of assets, and (2) a historical compensation analysis of the Participants.  Shapiro Declaration, at ¶¶ 16, 25.

31.    In connection with the bankruptcy comparisons, BRG examined groups of 10-11 companies that (a) have filed for bankruptcy in the last five years, (b) implemented an incentive plan to reward participants for store closing and asset sales that involved a sale of most or substantially all assets and a retention plan, and (c) had prepetition revenue and assets between $230 million and $5.5 billion and between $46 million and $2 billion, respectively.  The median revenue and assets for the KEIP comparison set was $800 million and $300 million, respectively, which is generally consistent with the size of the Debtors' business.  BRG compared the KERP and KEIP Plan with comparative key employee incentive and retention plans based on target cost, target cost per participant, and target cost as a percentage of revenue and assets.  BRG concluded that compared to the other companies, the total target cost of the KERP and KEIP Plan on average was well within the range of the comparable benchmarks.  Shapiro Declaration, at ¶¶ 15-18, 24-27.

32.    The members of the BTC, after consultation with BRG and counsel, reviewed and discussed and approved the proposed KERP and KEIP Plan in the exercise of their business judgment.  Shapiro Declaration, at ¶ 27.  The BTC believes that it strikes the proper balance between the goals of the KERP and KEIP Plan and the liquidity available to the Debtors.  *Id.*

60917/0001-20725139v3

## IV.    **RELIEF REQUESTED**

33.    By this Motion, the Debtors seek entry of the Proposed Order pursuant to sections 105(a), 363(b), 503(b), 503(c) and 507(a)(2) of the Bankruptcy Code approving the KERP and KEIP Plan and granting related relief.

34.    For the reasons set forth herein, the Debtors submit that the relief requested is in the best interest of the Debtors, their estates, creditors, stakeholders, and other parties-in-interest and, therefore, should be granted.

## V.    **BASIS FOR RELIEF REQUESTED**

35.    A company's decision to file for chapter 11 necessarily creates difficulties for its employees and can lead to retention problems, low morale, and low productivity.  Unfortunately, these negative consequences affect the company's ability to continue its normal business operations, maintain vendor and customer support, and impair the company's ability to maximize value and achieve the highest possible recovery for its stakeholders.  For this reason, bankruptcy courts have long authorized incentive and retention plans designed to reduce disruption to employees while improving morale and incentivizing job performance.  Courts have routinely approved payments under these plans pursuant to section 363(b) of the Bankruptcy Code as a prudent exercise of a debtor's business judgment.  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 did not eliminate the use of these plans and continues to permit payments and added protections that are offered to employees.

36.    The Debtors seek approval of the KERP and KEIP Plan to maintain their business operations, improve and preserve their financial condition, facilitate their reorganization efforts and otherwise meet their debtor-in-possession duties during the pendency of these chapter 11 cases.  These goals cannot be met without the support of the Employees.  It is crucial to the

Debtors' efforts to preserve and maximize value that the Debtors incentivize and retain certain

key Employees to deliver their best performance throughout these chapter 11 cases.  The

Employees covered by the KERP and KEIP were identified after substantial, careful

consideration and only after it was determined that each was critical to the maintenance of the

Debtors' operations and the success of the Debtors' restructuring efforts.  To that end, such

Employees are highly skilled, and their skill, institutional knowledge, and work ethic are crucial

to the Debtors' restructuring efforts.  Without the implementation of the KERP and KEIP Plan,

the Debtors believe that certain of the Employees may pursue other employment and may not be

incentivized to perform optimally.

37.    For these reasons and others, the Debtors believe that implementation of the

KERP and KEIP Plan is critical and aligns the interests of the Participants with those of the

Debtors' stakeholders with the intent to maximize the value of the Debtors' estates.

**A.    The KERP and KEIP Plan Should be Approved as a Reasonable Exercise of the Debtors' Business Judgment**

38.    The KERP and KEIP Plan has been designed by the Debtors, in consultation with

their advisors (as described above), to incentivize performance and ensure continued

employment of the eligible Employees within the parameters of sections 363(b) and 503(c) of the

Bankruptcy Code.[4]  The prohibitions and restrictions in section 503(c)(1) and (2) do not apply

---

[4]    (c) Notwithstanding subsection (b), there shall neither be allowed, nor paid –
(1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that-
      (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
      (B) the services provided by the person are essential to the survival of the business; and
      (C) either-
      (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

15

here, as those provisions restrict the ability of "insiders" to receive payments as part of retention or severance plans.  As described below, the KEIP is an incentive plan (rather than a retention or severance plan), and the KERP applies solely to non-insiders.

> **(i)    The KERP Applies Only to Non-Insiders and is Not Prohibited by Sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code**

39.    The KERP is not subject to section 503(c)(1) or (c)(2) of the Bankruptcy Code, both of which apply to insiders exclusively.  Section 101(31)(B) of the Bankruptcy Code defines an "insider" as any director, officer, person in control of the debtor, partnership where the debtor is a general partner, general partner of the debtor, or relative of a general partner, director, officer, or person in control of the debtor.  *See* 11 U.S.C. § 101(31)(B).  None of the KERP Participants meets this definition of "insider."

40.    Although any person holding an officer's title is presumptively an officer and, thus, an insider, that presumption can be rebutted.  *In re Foothills Texas, Inc*., 408 B.R. 573 (Bankr. D. Del. 2009).  Specifically, "[a] party seeking to rebut that presumption must present evidence sufficient to establish that the person holds the title of an officer in name only and, in fact, does not meet the substantive definition of the same, *i.e*., he or she is not taking part in the management of the debtor."  *Id.* at 574-75.

---

(ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such management employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;
(2) a severance payment to an insider of the debtor, unless-
(A) the payment is part of a program that is generally applicable to all full-time employees; and
(B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or
(3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c).

41.    The KERP Participants, to the extent they hold "officer" titles, are officers in name only.  None of the KERP Participants are a member of the Board, or has been elected or appointed to their position by the Board.  The KERP Participants have no authority to make company-wide decisions for the Debtors, and do not report to the Board.  *See In re Global Aviation Holdings Inc*., 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) (finding that director-level employees were not "officers" because none of them were members of the board, participated in corporate governance, attended board meetings or reported to the board).  Furthermore, the KERP Participants' duties do not extend to the Debtors' business operations as a whole.  Rather, their duties are restricted to a particular aspect or division of the Debtors' business.  Finally, all of the KERP Participants with the title of "Vice President" or the like, which are common in the Debtors' industry, report to a more senior employee of the Debtors, and must obtain approval from appropriate senior personnel before taking any significant action with respect to, among other things, the Debtors' corporate policies or the disposition of significant assets.

42.    Therefore, while the titles of certain of the KERP Participants reflect their individual roles and functions, they do not confer officer status upon these Employees, and thus they do not take part in the direction or management of the Debtors' overall business operations, notwithstanding the valuable role that they play in the Debtors' organization.  Courts have declined to find insider status where the scope of authority is similarly limited.  *See In re Borders Group, Inc*., 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (employees in retention plan were not insiders because none of them had authority to implement company policy, did not report to board of directors, and were subordinate to actual officers).  The titles of the KERP Participants reflect their individual functions and roles, but do not reflect "insider" status as the court discussed in *Foothills*.  *See In re NMI Systems, Inc.*, 179 B.R. 357, 370 (Bankr. D.D.C. 1995)

(finding that vice president was not an insider because he was conferred title "for purposes of marketing" only and was not "in the inner circle making the company's critical financial decisions.").

43.     Accordingly, the Debtors submit that certain KERP Participants are officers in name only, do not take part in the management of the Debtors, and therefore are not "insiders." For the balance of the KERP Participants, the Debtors submit that both their titles and roles performed dictate that they are not "insiders" and, therefore, not precluded from participating in the KERP.

      **(ii)**        **The KEIP Is Not Prohibited by Sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code**

44.     The KEIP is permissible under section 503(c) of the Bankruptcy Code.  Section 503(c)(1) of the Bankruptcy Code restricts payments made to "insiders of the debtor for the purpose of inducing such person to remain with the debtor's business," essentially "pay to stay" plans.  11 U.S.C. § 503(c)(1); *see also In re Global Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (finding that proposed incentive plans were "primarily incentivizing and only coincidentally retentive" and noting, "The fact that . . . all compensation has a retention element" did "not reduce the Court's conviction" that the debtors' primary goal in approving the incentive plans was "to create value by motivating performance").

45.     The Debtors recognize that the KEIP Participants are insiders.  The KEIP, however, is an incentive plan with appropriate performance targets that will be challenging to meet.  The KEIP is not simply a retention plan meant to ensure continued employment for insiders, which is prohibited by section 503(c)(1) of the Bankruptcy Code, nor a severance plan prohibited by section 503(c)(2) of the Bankruptcy Code.  To the contrary, the KEIP is an incentive plan for key senior executives designed to motivate them to improve sales and

company performance and consummate a Restructuring Transaction.  Consequently, the KEIP is

not prohibited under section 503(c)(1) or (2), but, rather, is "justified by the facts and

circumstances" of these Chapter 11 Cases, consistent with section 503(c)(3) of the Bankruptcy

Code.

46.    More specifically, achieving the KEIP Target will require significant efforts by

the KEIP Participants and is difficult to attain given the complexity of these Chapter 11 Cases,

the effects of the commencement of the Chapter 11 Cases on business operations, and the recent

developments of the COVID-19 pandemic.

47.    The KEIP Target is aggressive, and as a result, the KEIP Participants will need to

focus their operations and fiscal efforts to preserve liquidity and drive sales.  Due to the

bankruptcy process, the impact of COVID-19 on the Debtors' business, and the vendors' concern

about being paid, many vendors have shortened terms or required payment on delivery. As a

result, the Debtors are constantly challenged to preserve their limited funding in such a manner

that both vendor and customer demands are satisfied.  The KEIP Participants have succeeded

thus far through their daily efforts across the Debtors' supply chain, sales, trade marketing, and

finance and accounting organizations to manage this process within the limits of their budget.

Approval of the KEIP will motivate them to continue this process during the pendency of the

Chapter 11 Cases.

48.    Although the KEIP might encourage the KEIP Participants to remain with the

Company through the consummation of the eCommerce Sale and the liquidation sales, that effect

does not mean that the KEIP is solely a retention-driven plan.  *See, e.g.*, *In re Global Homes*

*Prods., LLC*, 369 B.R. at 786.  A plan that indirectly causes its participants to remain employed

does not detract from the KEIP's primary purpose, which is to motivate the KEIP Participants to

maximize value for the Debtors' estates and, in turn, motivate the workforce at large to ensure

that recoveries are maximized for all stakeholders.

49.     In *Global Home Products*, the bankruptcy court set forth various factors for

evaluating whether a debtor has satisfied the "sound business judgment" test for purposes of the

approval of a management incentive plan under Bankruptcy Code section 503(c)(3). These

factors include: (a) whether the plan is calculated to achieve the desired performance; (b)

whether the cost of the plan is reasonable in the context of the debtor's assets, liabilities. and

earning potential; (c) whether the scope of the plan is fair and reasonable or whether it

discriminates unfairly; (d) whether the plan is consistent with industry standards; (e) whether the

debtor employed appropriate due diligence efforts in developing the plan; and (f) whether the

debtor received independent counsel in performing due diligence and in creating and authorizing

the incentive compensation. *See In re Glob. Home Prods*., 369 B.R. at 786 (citing *In re Dana

Corp*., 358 B.R. at 576–77).

50.     The KEIP is a reasonable exercise of the Debtors' sound business judgment

because it was carefully designed, with input from the Debtors' advisors, and seeks to incentivize

certain senior executives' performance to continue the Debtors' day-to-day operations, focus on

improving performance, and ensure a timely and successful exit from chapter 11.  Thus, as set

forth below, the *Global Home Products* factors strongly weigh in favor of approval of the

Debtors' KEIP in these Chapter 11 Cases.

51.     <u>First</u>, the KEIP is calculated to achieve desired performance.  It creates a

reasonable relationship between the proposed award and the results to be obtained:  the program

awards incentive compensation based on the KEIP Participants' satisfaction of specific overall

performance targets for the Company, which can only be achieved through the dedication and effort of the KEIP Participants.

52.     Second, the incentive payments contemplated in the KEIP are reasonable and fair. It is common for companies of the Debtors' size to have an incentive program.  Indeed, an executive incentive plan has been part of the Debtors' compensation packages for some time, and consequently they seek to implement the KEIP to replace the incentive compensation that has traditionally been awarded under prepetition incentive plan(s).  The KEIP was not developed for purposes of retaining executives during the chapter 11 cases.

53.     Third, the KEIP is reasonable in scope because it only applies to two (2) executive officers.  The Debtors must rely on the efforts of those two (2) KEIP Participants, and their performance will have the greatest impact on the maximization of value of the Debtors' estates during these Chapter 11 Cases.

54.     Fourth, the Debtors worked closely with their advisors to develop the KEIP.  The version of the KEIP submitted herein for approval is the latest iteration, which reflects the reasoned opinions and comments of the various professionals whose input was considered in designing the program.  The KEIP is, the Debtors submit, a reasonable exercise of their sound business judgment.

55.     Fifth, the Debtors and their advisors reviewed multiple incentive plans implemented in other comparable chapter 11 proceedings.  The KEIP Participants were carefully selected by the BTC to include only those Employees who would have the greatest impact on these Chapter 11 Cases.  In conjunction therewith, the KEIP was designed with consideration of comparable programs and the incentive objectives that the Debtors seek to establish.

56.     Finally, the Debtors submit that meeting the KEIP Target would be a significant achievement meriting the payment of the KEIP Bonuses.  To earn their KEIP Bonuses, the KEIP Participants must continue business operations in a manner that ensures the continued success of the Debtors.  As a result, KEIP Participants have a strong incentive to generate substantial value for the Debtors' estates.

57.     For these reasons, the Debtors submit that the KEIP is justified by the facts and circumstances of these Chapter 11 Cases and, therefore, should be approved.

**(iii)    The KERP and KEIP Should be Approved Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code**

58.     Because the KERP and KEIP are not prohibited by sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code, the Debtors submit that the Court should authorize the Debtors to implement the plans under sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

59.     The standard for approving payments under section 503(c)(3) is essentially the same "business judgment" standard for approving similar transactions under section 363(b)(l) of the Bankruptcy Code.  *See, e.g.*, *In re Nellson Nutraceutical, Inc.,* 369 B.R. 787, 804 (Bankr. D. Del. 2007) (holding that, because bonus plan's primary motivation was not retentive, section 503(c)(l) did not apply and business judgment standard was to be used to assess plan); *In re Global Home Products, LLC*, 369 B.R. at 787 (same).

60.     Section 363(b)(1) of the Bankruptcy Code allows a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing, in the exercise of the Debtors' business judgment.  11 U.S.C. § 363(b)(1); *see also, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) (stating that under normal circumstances, courts will defer to debtor's judgment in using property under section 363(b) if there is legitimate business justification).  Therefore, the estate's property may be used other than in the ordinary course of

business if the debtor can show a "sound business purpose" for such use.  *See In re Lionel Corp.*,
722 F.2d 1063, 1071 (2d Cir. 1983) ("[t]he rule we adopt requires that a judge determining a §
363(b) application expressly find from the evidence presented before him…a good business
reason to grant the application."); *In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D.
Del. 1991).  If a debtor shows a valid business purpose, the court applies the "business judgment
rule," a presumption "that in making a business decision, the directors of a corporation acted on
an informed basis, in good faith and in the honest belief that the action taken was in the best
interest of the company."  *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985).

61.     Applying the business judgment rule in chapter 11 cases, courts have routinely
permitted employee payments that are outside the normal course of business.  *See, e.g.*, *Dai-Ichi
Kangyo Bank Ltd. v. Montgomery Ward Holding Corp.* (*In re Montgomery Ward Holding
Corp.*), 242 B.R. 147, 153-55 (D. Del. 1999) (affirming bankruptcy court's authorization of key
employee compensation program, holding "[i]n determining whether to authorize the use, sale,
or lease of property of the estate under [section 363(b)], courts require the debtors to show that a
sound business purpose justifies such actions"); *In re Global Home Products*, 369 B.R. at 784
("The reasonable use of incentives and performance bonuses are considered the proper exercise
of a debtor's business judgment."); *see also In re Martin*, 91 F.3d at 395 (citing *Fulton State
Bank v. Schipper* (*In re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)).

62.     The KERP and KEIP each represent a sound business purpose and satisfy the
business judgment rule.  The KERP and KEIP will facilitate the Debtors' restructuring goals by
incentivizing crucial Employees to ensure that regular business operations thrive and that a
restructuring is consummated in an effort to preserve and maximize value for the benefit of all
stakeholders.  These goals cannot be met if skilled key Employees depart prematurely or if

60917/0001-20725139v3

executives are not incentivized.  Payments under the KEIP directly incentivize key executives.

The KERP serves another important purpose by offering non-insider Employees with security

and a reward for remaining loyal to the Debtors during this critical period.

63.     For the foregoing reasons, the Debtors submit that approval of the KERP and

KEIP Plan is in the best interest of the Debtors' estates, their creditors, and all parties in interest,

and should therefore be granted.

## VI.     NO PRIOR REQUEST

64.     No prior request for the relief sought in this Motion has been made to this Court

or any other court.

## VII.     NOTICE

65.     Notice of this Motion has been provided to (i) the Office of the United States

Trustee for Region 3; (ii) the holders of the thirty (30) largest unsecured claims against the

Debtors (on a consolidated basis); (iii) counsel for the administrative agent under the Debtors'

pre-petition revolving credit facility, Wells Fargo Bank, National Association, c/o Otterbourg

P.C. (Attn: Daniel F. Fiorillo, Esq. and Chad B. Simon, Esq.), 230 Park Avenue, New York, NY

10169-0075; (iv) counsel for any official statutory committee of unsecured creditors; (v) the

Internal Revenue Service; (vi) the United States Attorney's Office for the District of New Jersey;

and (vii) any party requesting notice pursuant to Bankruptcy Rule 2002.  The Debtors submit

that, in view of the facts and circumstances, such notice is sufficient and no other or further

notice need be provided.

60917/0001-20725139v3

WHEREFORE, the Debtors respectfully request entry of the proposed Order and the

granting the relief requested herein and such other and further relief as the Court may deem just

and appropriate.

Dated:  July 29, 2020                              Respectfully submitted,

                                                  **COLE SCHOTZ P.C.**


                                                  By:____/s/ Michael D. Sirota_____
                                                       Michael D. Sirota, Esq.
                                                       Stuart Komrower, Esq.
                                                       Ryan T. Jareck, Esq.
                                                       Matteo W. Percontino, Esq.
                                                       Court Plaza North
                                                       25 Main Street
                                                       Hackensack, NJ 07601
                                                       Telephone: (201) 489-3000
                                                       Facsimile:  (201) 489-1536
                                                       Email: msirota@coleschotz.com
                                                              skomrower@coleschotz.com
                                                              rjareck@coleschotz.com
                                                              mpercontino@coleschotz.com

60917/0001-20725139v3