## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| RTW RETAILWINDS, INC., *et al.*, | Case No. 20-18445 (JKS) |
| Debtors.[1] | Joint Administration Requested |

### DECLARATION OF ROBERT SHAPIRO IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF

I, Robert Shapiro, being duly sworn, state the following under penalty of perjury:

1.      I am over the age of 18 and competent to testify.  I am a Director at Berkeley Research Group, LLC ("**BRG**") and Chief Restructuring Officer of the Debtors.  BRG is a global professional services firm which performs among other services, professional compensation services and was engaged by the Debtors.

2.      Except as otherwise noted, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents and information supplied to me by members of the Debtors' management and the Debtors' advisors.  I am authorized to submit this Declaration in support of the *Debtor's Motion for Entry of an Order (I) Approving Debtors' Key Employee Incentive Plan and Key*

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: RTW Retailwinds, Inc. (1445); Lerner New York Holding, Inc. (2460); Lernco, Inc. (4787); Lerner New York, Inc. (2137); New York & Company, Inc. (4569); Lerner New York GC, LLC (6095); Lerner New York Outlet, LLC (6617); New York & Company Stores, Inc. (6483); FTF GC, LLC (7341); Lerner New York FTF, LLC (6279); Fashion to Figure, LLC (6997); FTF IP Company, Inc. (6936).  The Debtors' principal place of business is 330 W. 34th St., 9th Floor, New York, New York 10001.

*Employee Retention Plan, and (II) Granting Related Relief* (the "**Motion**").[2]  If called to testify, I

would testify competently to the facts set forth herein.

## BACKGROUND AND QUALIFICATIONS

3.      I have close to ten (10) years of experience in the restructuring industry serving as

an advisor to private equity firms, corporations, lenders, and boards of directors of

underperforming businesses and companies in transition.   Before joining BRG in 2016, I was

employed by FTI Consulting, Inc. ("**FTI**").  Prior to FTI, I was employed by Carl Marks Advisors.

I have an undergraduate degree from Colorado College.

4.      I have experience advising organizations undergoing major financial transitions

including bankruptcies, initial public offerings, leveraged buyouts, and acquisitions.

5.      I was asked by the BTC to review the KERP and KEIP Plan (as defined below)

based on market practices of similarly situated companies. At the start of this engagement, BRG

became familiar with the Debtors' operational history and challenges.  BRG then reviewed and

became familiar with the Participants' (as defined below) existing salaries and incentive

compensation prior to the Petition Date.

## PREPETITION RETENTION PROGRAM

6.      Prior to the Petition Date, in April 2020, the Debtors implemented a retention

program geared towards ensuring that select employees remained with the Debtors until December

31, 2020 (the "**Prepetition Retention Program**"). The Debtors underwent a rigorous selection

process when developing the Prepetition Retention Program, whereby retention risk and business

impact were analyzed for each employee to determine the appropriate scope for participation in

---

[2]  All capitalized terms not otherwise defined in this Declaration have the meaning ascribed to them in the
Motion.

the Prepetition Retention Program. Only employees with a high business impact and some level of retention risk were included in the Prepetition Retention Program. Depending on the level of retention risk, eligible employees receive a retention amount equal to between 18% and 100% of such Prepetition Retention Program participants' base salary.  Total payouts under the Prepetition Retention Program were $2,350,000 to thirteen (13) employees.

7.      In the short time since the Petition Date, the Debtors have already lost one critical employee that was a participant in the Prepetition Retention Program.[3]  Accordingly, the Debtors and their advisors determined that it was in the estates' best interest to implement an additional retention program during these bankruptcy proceedings (and expand its reach) for those individuals who are deemed to be critical to the Debtors' ongoing operations, present a retention risk and would be difficult to replace.  Moreover, the Debtors and their advisors determined that it was necessary to supplement the Prepetition Retention Program with additional retention bonuses under the KERP for certain individuals to ensure such individuals were committed to the process (as opposed to such individuals electing to forego and repay the retention bonuses under the Prepetition Retention Program and pursue other opportunities to the detriment of the Debtors and their estates).

8.      Seven (7) KERP Participants (as defined below) were participants in the Prepetition Retention Program, and eleven (11) previous non-participants have been added to further secure the Debtors' critical workforce during this pivotal stage of the bankruptcy proceedings.  As with the Prepetition Retention Program participants, each KERP Participant was carefully selected and deemed critical to the Debtors' ability to maximize value for the benefit of all interested parties.

---

[3] Consistent with the Prepetition Retention Program, if the Employee voluntarily resigns from the employ of the Debtors on or before December 31, 2020, the Employee is required to promptly repay to the Debtors no later than ten (10) days after resignation an amount equal to the retention bonus on an after-tax basis.

60917/0001-20828826v3

Without payments under the proposed KERP, the Debtors believe that the KERP Participants are likely to pursue alternative employment, harming the value of the estates and affecting the implementation of the sale and liquidation process.

## OVERVIEW OF THE KERP AND KEIP PLAN

9.      I have familiarized myself with the Debtors' operations and unique challenges, reviewed the Debtors' Key Employee Incentive and Retention Plan (the "**KERP and KEIP Plan**"), gathered relevant market compensation data, and analyzed whether the proposed KERP and KEIP Plan is consistent with market practice.

10.     Based on my analysis, and the facts and circumstances, I have concluded that the KERP and KEIP Plan is reasonably designed to incentivize the beneficiaries and is consistent with typical market practices for the participants under the plan (the "**Participants**").  This conclusion is based on the following key elements:

(a)      the KERP awards hard to replace, non-insider and non-senior management employees who are important to the Debtors' restructuring to ensure they are retained and properly motivated to preserve and maximize the value of the Debtors' business for the benefit of stakeholders in the chapter 11 cases.

(b)      the KEIP awards insider employees with appropriately sized incentive payments (the "**KEIP Bonus**") if the KEIP Participants achieve challenging goals in connection with transactions involving the sale of the Debtors' eCommerce business and the store closing sales (the "**KEIP Target**"). The KEIP Bonus is necessary to ensure the Debtors' top executives are incentivized to maximize value for creditors by facilitating a competitive sale process;

(c)      the total cost of the KERP and KEIP Plan is reasonable compared to other similarly situated companies with similar incentive plans; and

(d)      the estimated level of compensation provided under the KERP and KEIP Plan, when considered within the context of total compensation, is reasonable in comparison to historical practices at the Debtors and market-based compensation of other similarly sized businesses.

60917/0001-20828826v3

## THE KERP

### A.    The KERP Participants

11.    There are eighteen (18) valuable, hard-to-replace, non-senior management and non-insider Employees (collectively, the "**KERP Participants**") in the KERP Plan.  The KERP was designed to ensure that valuable Employees who are important to the Debtors' restructuring are retained and properly motivated to preserve and maximize the value of the Debtors' business for the benefit of stakeholders in these Chapter 11 Cases.  Each KERP Participant was carefully selected by management and deemed critical to the Debtors' ability to maximize value for the benefit of all interested parties.  Without payments under the proposed KERP, the Debtors believe that the KERP Participants are likely to pursue alternative employment, harming the value of the estates and negatively affecting the Debtors' restructuring efforts.

### B.    KERP Design

12.    "KERP Bonuses" will be payable to each KERP Participant in the respective amounts identified on Schedule I to the KERP and KEIP Plan as follows (the "**KERP Bonuses**"): (i) 50% upon 30 days after the conclusion of the store closing sales pursuant to the Store Closing Motion; and (ii) 50% upon the earlier of the Employee's termination or December 31, 2020 (each such date shall be a KERP Effective Date and collectively are referred to as the "**KERP Effective Date**").  The total potential aggregate payout under the KERP is $625,000.  The KERP Bonuses on average equal 14% of the KERP Participants' annual salary.

13.    While a couple of the KERP Participants have titles that include words such as "vice president" which may suggest officer status, none of the KERP Participants is, in reality, an "insider" as defined in the Bankruptcy Code or under applicable law.  Although the KERP Participants are valuable to the Debtors' business and are particularly vital during these Chapter

5

11 Cases, their titles do not reflect that such Employees control the Debtors' operations. Each KERP Participant with the title of "vice president," or the like, which are common in the Debtors' industry, (i) has no corporate policy making authority or authority as to the disposition of the Debtors' assets, (ii) has no final decision making authority to make company-wide decisions, but rather is required to report to a more senior employee of the Debtors, which employee is required to approve any decisions, (iii) has no or limited signatory authority for the Debtors, and (iv) is not a named "executive officer."

14.    In addition, no KERP Participant is a member of the Board, was appointed by, or reports to, the Board.  Further, the KERP Participants' duties do not extend to the Debtors' business operations as a whole, but rather, are restricted to particular aspects or segments of the Debtors' business, and no KERP Participant has authority to make company-wide decisions on the Debtors' behalf.

**C.    Key Employee Retention Plan Market Assessment**

15.    To assess the reasonableness of the proposed KERP in the context of market practice, BRG engaged in a review of retention plans implemented in 10 other Chapter 11 cases.

16.    BRG examined a group of 10 companies that have filed for bankruptcy in the last five years, that implemented a retention plan to retain non-insiders, and that generally had prepetition revenue and assets between $225 million and $2 billion, respectively. BRG compared the KERP with comparative key employee retention plans based on total target cost and target cost per participant.  BRG concluded that compared to the 10 companies (a) the KERP as a percentage of sale for the Debtors was 0.08%, compared to a mean of 0.08%, and (b) the KERP as a percentage of assets for the Debtors was 0.15%, compared to a mean of 0.22%.  Moreover, the total cost of the KERP of $625,000 was significantly below the total cost of comparative KERP plans with a

6

median of $1,125,000 and mean of $1,633,000.  Further, the average KERP payout per eligible

employee is $35,000 and the mean in the comparable set was $62,000 per eligible employee.

17.     Based on my experience and analysis of the foregoing, the total maximum cost of

the KERP is appropriate in light of the number of KERP Participants.  Based upon my analysis of

the KERP, it is my belief that the structure of the KERP is consistent with typical market practices,

is fair and reasonable given the facts and circumstances, and provides anticipated value that is

appropriate to retain non-insider Employees to maximize the value of the Debtors' estates

## THE KEIP

### A.     The KEIP Participants

18.     There are five (5) KEIP Participants.  The five (5) KEIP Participants have unique

operational and historical knowledge of the Debtors' business and are leading the Debtors'

restructuring efforts, including their central roles in the sale of the Debtors' eCommerce business

and the liquidation of the Debtors' inventory through store closing sales.

19.     Accordingly, keeping the KEIP Participants properly incentivized and motivated

during the restructuring process, while also ensuring that they maintain their current day-to-day

responsibilities, is essential to maximizing the value of the Debtors' estates.

### B.     KEIP Design

20.     The BTC identified the KEIP Participants as the Employees who would have the

most measurable impact on the Debtors' efforts to maximize the value realized for stakeholders

during the Debtors' restructuring process.  Further, I understand that the BTC determined that it is

critical for the KEIP Participants to be appropriately incentivized to maximize the total value of

their estates in the transactions contemplated in these Chapter 11 cases. To that end, the BTC

directed BRG to design a KEIP to incentivize the KEIP Participants to facilitate a competitive

60917/0001-20828826v3

process for the Debtors' estates and create additional value for stakeholders.

21.    The KEIP covers five (5) insider employees who have spent, and will continue to spend, considerable time and effort driving and/or supporting various marketing and transaction efforts.    Each KEIP Participant, with his or her title and "Target KEIP Bonus," is set forth on Schedule II attached to the KERP/KEIP Plan.    There are five (5) KEIP Participants, which were identified by senior management and approved by the BTC. The KEIP Participants may earn a $900,000 incentive award, or on average $180,000 per participant (the "**KEIP Bonus**") which will be payable, if at all, upon the later of (x) the Sale; and (y) the conclusion of the store closing sales (the later of (x) or (y), the "**Target Trigger**"), in either case that provide for: (1) the successful repayment of all senior secured debt; (2) sufficient liquidity at the time of the Target Trigger to cover all anticipated administrative expense claims based on reasonable estimates under a plan or in the wind-down budget following the sale; and (3) excess proceeds after items (1) and (2) of $15,000,000 (the "**KEIP Target**").    Accordingly, the proposed KEIP is based on certain transaction-related goals. Specifically, the KEIP proposes to pay up to a total of $900,000 to the KEIP Participants.  The KEIP Awards range between 35% to 42% of the KEIP Participants' annual salary.

22.    In the event a KEIP Participant is terminated involuntarily due to job elimination, death, or permanent and total disability before he/she is eligible for the KEIP Award, that KEIP Participant will receive a pro rata portion of the KEIP, consistent with the proportion of time worked relative to the total time of the Debtors' Chapter 11 Cases.  If a KEIP Participant decides to depart or is terminated for cause before he/she is eligible for the KEIP Award, that Participant would forfeit any KEIP Awards.

23.    The KEIP is an incentive-based program because the Debtors' success in meeting

transaction goals and maximizing creditor recovery is the primary determinant as to whether the KEIP Participants earn incentive payments under the KEIP.  Performance goals for the KEIP represent a meaningful challenge and will require deft and efficient operation given  the numerous challenges facing a retailer amidst the COVID-19 pandemic including reduced store traffic, potential future store closures, significant competition from other liquidations and tempered interest from potential acquirors.  Accordingly, the KEIP is in no way a "lay up" but is designed to motivate KEIP Participants to maximize the value of the Debtors' estates.  Based on my experience and analysis of the foregoing, the design of the KEIP and the proposed KEIP Awards are reasonably designed to incentivize the KEIP Participants.

### C.    Key Employee Incentive Plan Market Assessment

24.    Similar to the KERP, to assess the reasonableness of the proposed KEIP in the context of market practice, BRG engaged in a review of incentive plans implemented in other chapter 11 cases.

25.    BRG examined a group of 11 companies that have filed for bankruptcy in the last five years, that implemented an incentive plan to reward participants for asset sales, and that generally had prepetition revenue and assets between $230 million and $2.5 billion and between $46 million and $2 billion, respectively. BRG compared the KEIP with comparative key employee incentive plans based on total target cost and target cost per participant.  BRG concluded that compared to the 11 companies (a) the KEIP as a percentage of assets for the Debtors was 0.22%, compared to a median of 0.30%, and (b) the KEIP as a percentage of sales for the Debtors was 0.11%, compared to a median of 0.15%.  Moreover, the total cost of the KEIP of $900,000 was significantly below the total cost of comparative KEIP plans with a median of $1.5 million and mean of $1.75 million.  Further, the average KEIP payout per eligible employee is $180,000

9

whereas the mean in the comparable set was $339,000 per eligible employee.

26.    Based on my experience and analysis of the foregoing, the total maximum cost of the KEIP is appropriate in light of the number of KEIP Participants.  Based upon my analysis of the KEIP, it is my belief that the structure of the KEIP is consistent with typical market practices, is fair and reasonable given the facts and circumstances, and provides anticipated value that is appropriate to competitively motivate talented employees to maximize the value of the Debtors' estates.

27.    The members of the BTC, after consultation with BRG and counsel, reviewed and discussed and approved the proposed KERP and KEIP Plan in the exercise of their business judgment.  I understand the BTC believes that it strikes the proper balance between the goals of the KERP and KEIP Plan and the liquidity available to the Debtors.

60917/0001-20828826v3

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Date: July 27, 2020

Robert Shapiro
Chief Restructuring Officer

11